21-1769-cv
*Melendez v. Sirius XM Radio, Inc.*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2021

(Argued: March 8, 2022      Decided: October 4, 2022)

No. 21-1769-cv

_____

JOHN EDWARD MELENDEZ,

*Plaintiff-Appellant,*

— v. —

SIRIUS XM RADIO, INC., A DELAWARE CORPORATION

*Defendant-Appellee.*

_____

Before:         LOHIER, BIANCO, and ROBINSON, *Circuit Judges.*

Plaintiff John Edward Melendez appeals from the judgment of the United States District Court for the Southern District of New York (Crotty, *J.*), which granted defendant Sirius XM Radio, Inc. ("Sirius XM")'s motion to dismiss Melendez's claims with prejudice for violations of his right of publicity under California common and statutory law because his claims were preempted by the Copyright Act, 17 U.S.C. § 301.  The claims arise from Melendez's performance under the moniker "Stuttering John" on *The Howard Stern Show* (the "HS Show")

from 1988 until 2004. Pursuant to a license, Sirius XM airs current, newly-released episodes of the HS Show, as well as full and partial past episodes from the HS Show's archives that feature Melendez's performances. Melendez asserts that Sirius XM's use of excerpts of him from the archival episodes in its online and on-air advertisements promoting the HS Show violate his right of publicity under California common and statutory law because his name and likeness have been exploited for Sirius XM's commercial gain without his permission.

We agree with the district court that Melendez failed to plausibly allege any use of his name or likeness that is separate from, or beyond, the rebroadcasting, in whole or in part, of the copyrightable material from the HS Show's archives and, thus, his right of publicity claims are preempted by the Copyright Act. Moreover, because Melendez has failed to articulate any allegations that he could add in a second amended complaint that overcome preemption in this case, we conclude that the district court correctly determined that any leave to re-plead would be futile and properly dismissed his claims with prejudice.

Accordingly, we **AFFIRM** the judgment of the district court.

> MICHAEL S. POPOK, Zumpano Patricios & Popok, PLLC, New York, NY, *for Plaintiff-Appellant*.
>
> MARK A. BAGHDASSARIAN, Kramer Levin Naftalis & Frankel LLP, New York, NY, *for Defendant-Appellee*.

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiff John Edward Melendez ("Melendez" or "plaintiff") appeals from the judgment of the United States District Court for the Southern District of New York (Crotty, *J*.), which granted the motion to dismiss the claims with prejudice that he brought against Sirius XM Radio, Inc. ("Sirius XM"), a satellite and

2

streaming radio provider, for alleged violations of his right of publicity under both California common and statutory law.

The claims at issue arise from Melendez's performance under the moniker "Stuttering John" on *The Howard Stern Show* (the "HS Show") from 1988 until 2004. Two years after Melendez left the HS Show, Sirius XM reached an agreement through which it obtained a license to air current, newly-released episodes, as well as full and partial past episodes from the HS Show's archives. Melendez appears in many of these archival episodes, excerpts of which Sirius XM uses in its online and on-air advertisements to promote the HS Show. Melendez claims that these advertisements violate his right of publicity under California common and statutory law because his identity, persona, name, and image have been exploited for Sirius XM's commercial gain without his permission.

We agree with the district court that Melendez failed to plausibly allege any use of his name or likeness that is separate from, or beyond, the rebroadcasting, in whole or in part, of the copyrightable material from the HS Show's archives and, thus, his right of publicity claims are preempted by the federal Copyright Act, 17 U.S.C. § 301. Moreover, because Melendez has failed to articulate any allegations that he could add in a second amended complaint that overcome preemption in

3

this case, we conclude that the district court correctly determined that any leave to re-plead would be futile and properly dismissed the claims with prejudice.

Accordingly, for the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### I.      Factual Summary[1]

Melendez describes himself as a "well-known celebrity admired by tens of millions of fans" for over thirty years. Joint App'x at 10. He began his career in the entertainment industry as an unpaid college intern for the HS Show in 1988. Soon thereafter, Howard Stern ("Stern"), the HS Show's creator and host, learned that Melendez suffered from a speech impediment and sought to exploit his stutter on-air for comedic effect. Branded "Stuttering John," Melendez contributed regularly to the HS Show, becoming well-known for the interviews he conducted with politicians and celebrities that featured "impertinent, confrontational, and intentionally clueless questions in the street, at red carpet events and during promotional appearances and press conferences to shock his targets and elicit

---

[1] These factual allegations are taken from Melendez's amended complaint. We accept them as true in reviewing Sirius XM's motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

laughs." Joint App'x at 13. Melendez remained a writer and on-air contributor on the HS Show until February 2004, when he departed to become an announcer and performer on *The Tonight Show* with Jay Leno.

Two years after Melendez left the HS Show, Stern reached a five-year, $500 million agreement with Sirius XM through which Sirius XM acquired a license to air the HS Show on two Stern-centric channels. The agreement stipulated that one channel would air current, newly released episodes of the HS Show, while the other would air full and partial past episodes from the HS Show's archives. Melendez alleges that every episode in which he participated throughout his fifteen years on the HS Show was digitally recorded and stored in the archives licensed to Sirius XM. In total, Melendez estimates that the archives contain approximately 13,000 hours of episodes where his voice, name, and identity are featured.

Since entering the licensing agreement with Stern, Sirius XM has used audio and visual segments of archival episodes to advertise the HS Show, both online and on-air. Certain of these advertisements feature Melendez. According to Melendez, Sirius XM never obtained his consent before using his name or

likeness.[2] Melendez claims that these advertisements have enhanced Sirius XM's subscription base and attracted and retained subscribers to Sirius XM and its Stern-centric channels, all at his expense.

## II. Procedural History

On August 19, 2020, Melendez filed a complaint against Sirius XM in the Southern District of New York, which he then amended on January 6, 2021. His amended complaint contains two claims, both alleging that Sirius XM breached his right of publicity under California law—one claim under California common law and the other claim under California statutory law, California Civil Code § 3344.

Sirius XM subsequently moved to dismiss Melendez's amended complaint, and the district court granted the motion on June 24, 2021. Judgment was entered the following day. In dismissing the amended complaint with prejudice, the district court reasoned that the federal Copyright Act preempted Melendez's

---

[2] In the amended complaint, Melendez uses the term "Plaintiff's Attributes" to refer collectively to "his identity, persona, name, and image," which he alleges were exploited by Sirius XM for commercial gain. Joint App'x at 8. For purposes of this opinion, we use the phrase "name or likeness" to broadly encompass one or more of his attributes that could arguably be implicated in this case under California's common or statutory law right of publicity based upon the allegations in the amended complaint, including his identity, voice, photograph, image, and/or persona.

claims. Specifically, the district court explained, Melendez failed to "plead any facts plausibly suggesting that Sirius [XM's] intended audience could reasonably construe advertisements of the HS Show featuring Melendez as Stuttering John as Melendez's endorsement of Sirius XM or any of its non-HS Show channels." *Melendez v. Sirius XM Radio, Inc.*, No. 1:20-CV-6620-PAC, 2021 WL 2593471, at *5 (S.D.N.Y. June 24, 2021). Moreover, the district court found that Melendez's right of publicity claims were "effectively claims for the wrongful rebroadcasting of copyrightable sound recordings." *Id.* at 6. Thus, his allegations were "not qualitatively different from copyright infringement claims" and were therefore subject to preemption. *Id*. The district court also denied Melendez leave to file a second amended complaint, reasoning that "[r]epleading would be futile, because Plaintiff's claims have a substantive problem rather than an issue of inartful pleading." *Id*. This appeal followed.

## DISCUSSION

### I. Standard of Review

We review the district court's grant of Sirius XM's motion to dismiss *de novo*, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *Olson v. Major League Baseball*, 29

7

F.4th 59, 71 (2d Cir. 2022). For the amended complaint to survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), it "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

## II.     The Right of Publicity Under California Law

Melendez brings his right of publicity claims under California law.[3] California law contains both a common law and a statutory basis for such claims. Melendez alleges that Sirius XM violated his rights under both bases of liability.

### A.     *California Common Law*

California common law recognizes a "right of privacy for protection of a person's name and likeness against appropriation by others for their advantage." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001). This "so-called

---

[3] The parties did not dispute the application of California law before the district court, and they likewise do not do so in the instant appeal.

right of publicity" has been defined by the California Supreme Court as, in essence, an acknowledgement that

> the reaction of the public to name and likeness, which may be fortuitous or which may be managed or planned, endows the name and likeness of the person involved with commercially exploitable opportunities. The protection of name and likeness from unwarranted intrusion or exploitation is the heart of the law of privacy.

*Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 824 (1979).

California courts require plaintiffs to satisfy several elements in order to prevail on a common law cause of action for misappropriation of the right of publicity. These elements are: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307, 313 (Cal. Ct. App. 2001).

### B.    *California Statutory Law*

In 1971, California codified the right of publicity and created a statutory basis to bring such a claim. The operative statute authorizes "recovery of damages by any living person whose name, photograph, or likeness has been used for commercial purposes without his or her consent." *Comedy III Prods., Inc. v. Gary*

9

*Saderup, Inc.*, 25 Cal. 4th 387, 391 (2001).  Specifically, California Civil Code Section

3344 ("Section 3344") provides:

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof.

Cal. Civ. Code § 3344(a).

This statute "is best understood as 'complementing,' rather than enacting,

the common law cause of action, because the two are not identical."  *Abdul-Jabbar*

*v. Gen. Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996).  In particular, unlike a common

law claim, a Section 3344 claim is "limited to commercial appropriations."  *Id*.

Accordingly, to prevail on a claim for misappropriation of the right of publicity

under the statute, a plaintiff must prove not only the elements of a common law

claim, but also must demonstrate:  (1) "knowing use by the defendant" and (2) "a

direct connection between the alleged use and the commercial purpose."  *Stewart*

*v. Rolling Stone LLC*, 105 Cal. Rptr. 3d 98, 111 (Cal. Ct. App. 2010*), as modified on*

*denial of reh'g* (Feb. 24, 2010) (citation omitted).

## III. Statutory Preemption[4]

Even if a party can satisfy the elements of a claim for violation of the right of publicity under state law, the doctrine of preemption may limit the viability of the claim in certain circumstances. Although preemption is an affirmative defense, this doctrine "can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint." *Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 28 (2d Cir. 2015) (quotation marks omitted).

As the Supreme Court has explained, a "fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). The Copyright Act of 1976 is one such instance where Congress has embraced this constitutional power. In passing the Copyright Act, Congress sought to create a "national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989). The purpose of the Copyright Act was "essentially to ensure a nationwide, uniform federal copyright

---

[4] A separate, though related, preemption doctrine also sometimes applies in the copyright context: implied preemption. *See, e.g.*, *In re Jackson*, 972 F.3d 25, 34 (2d Cir. 2020). Because neither the parties nor the district court raised implied preemption, we decline to address any potential application of this doctrine here. Our analysis therefore focuses exclusively on statutory preemption.

system, [by] ousting the states from imposing any control of the area." *Jackson*, 972

F.3d at 42. Accordingly, the Copyright Act "preempts state law claims asserting

rights equivalent to those protected within the general scope of the statute."

*Urbont v. Sony Music Ent.*, 831 F.3d 80, 93 (2d Cir. 2016).

Section 301 of the Copyright Act specifically addresses the issue of

preemption and the situations in which the doctrine applies. This Section

provides:

> On and after January 1, 1978, all legal or equitable rights that are
> equivalent to any of the exclusive rights within the general scope of
> copyright as specified by section 106 in works of authorship that are
> fixed in a tangible medium of expression and come within the subject
> matter of copyright as specified by sections 102 and 103, whether
> created before or after that date and whether published or
> unpublished, are governed exclusively by this title. Thereafter, no
> person is entitled to any such right or equivalent right in any such
> work under the common law or statutes of any State.

17 U.S.C. § 301(a).

In applying this statute to determine if a state law claim is preempted by the

Copyright Act, courts in this Circuit apply a two-part test, both parts of which

must be satisfied for preemption to apply. *See Jackson*, 972 F.3d at 42–43. We have

referred to the first prong of this test as the "subject matter" requirement and the

second prong as the "general scope" or "equivalence" requirement. *See, e.g., Nat'l*

12

*Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997); *Jackson*, 972 F.3d at 42–43.

### A.    *Subject Matter Requirement*

The subject matter requirement of the test is satisfied when the plaintiff's "claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004).  When applying the subject matter requirement, a court must "look[] at the work that would be affected by the plaintiff's exercise of a state-created right, and require[] (as an essential element of preemption) that the work 'come within the subject matter of copyright as specified by sections 102 and 103 [of the Copyright Act].'" *Jackson*, 972 F.3d at 42 (quoting 17 U.S.C. § 301(a)).

Under Section 102(a) of the Copyright Act, "works of authorship" include, among other things, "motion pictures and other audiovisual works" and "sound recordings."[5]  17 U.S.C. § 102(a)(6), (a)(7).  Importantly, to satisfy the subject matter

---

[5]  Section 102(a) provides as follows:

Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or

requirement, a work does not have to "consist entirely of copyrightable material."

*Briarpatch*, 373 F.3d at 305. Instead, it "need only fit into one of the copyrightable

categories [set forth in 17 U.S.C. §§ 102 and 103] in a broad sense." *Id*.

### B.      *General Scope Requirement*

For the general scope requirement of the test to be satisfied, "the state-

created right may be abridged by an act that would, by itself, infringe one of the

exclusive rights provided by federal copyright law." *Id*. In evaluating the

application of this prong, a court "looks at the right being asserted (over a work

that comes within the 'subject matter of copyright') and requires (for preemption

to apply) that the right be '*equivalent* to any of the exclusive rights within

the *general scope of copyright* as specified by section 106 [of the Copyright Act].'"

*Jackson*, 972 F.3d at 43 (quoting 17 U.S.C. § 301(a)). These exclusive rights include

the right:

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;

device. Works of authorship include the following categories: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works.

17 U.S.C. § 102(a). Section 103 concerns "compilations and derivative works," which are irrelevant to Melendez's claims in the instant lawsuit. *Id.* at § 103.

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

As we have explained, for preemption to apply, "the state law claim must involve acts of reproduction, adaptation, performance, distribution or display" and "must not include any extra elements that make it qualitatively different from a copyright infringement claim." *Briarpatch*, 373 F.3d at 305. Thus, "when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur." *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985).

Rather than simply performing a "'mechanical' search for extra elements," courts must instead engage in a "holistic evaluation of the nature of the 'rights sought to be enforced'" and then make "a determination whether the state law action 'is *qualitatively* different from a copyright infringement claim.'" *Jackson*, 972

15

F.3d at 44 n.17 (quoting *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). Only if the claim differs qualitatively from a copyright infringement claim will preemption not apply.

## IV.    Application

Reviewing the allegations Melendez makes in his amended complaint *de novo*, we hold that his claims are preempted by the Copyright Act because they fall within both the subject matter requirement and the general scope requirement of the applicable test under our precedent. Accordingly, the district court properly dismissed Melendez's claims in the amended complaint with prejudice.

### A.    *Subject Matter Requirement Prong*

We first examine whether the works that Melendez argues violate his right of publicity come within the subject matter of copyright, as specified in the relevant provisions of the Copyright Act. Specifically, Melendez claims that his "[a]ttributes are the 'work' that is affected by the exercise of his state-law right, and they are not works of authorship, nor can they be fixed in any tangible medium of expression." Appellant's Br. at 18. In contrast, Sirius XM takes the position that the HS Show archives are "recordings fixed in a tangible medium and thus, at a minimum, relate to copyrightable subject matter." Appellee's Br. at 13.

We recently analyzed a similar dispute regarding preemption of the right of publicity where the parties, as here, disagreed as to the specific focus of the plaintiff's claim. *See Jackson*, 972 F.3d at 45. In *Jackson*, we considered a right of publicity claim that the rapper Curtis James Jackson III (known professionally as "50 Cent") brought under Connecticut law against another rapper, William Leonard Roberts II (known professionally as "Rick Ross"). *Id.* at 30–31. Jackson claimed that Roberts misappropriated his identity for unauthorized commercial use when Roberts used a recognizable sample of Jackson's song "In Da Club," as well as Jackson's stage name, in a song on his mixtape *Renzel Remixes*. *Id*. Roberts, however, argued that Jackson's claim was not based on Jackson's likeness, but rather on the copyrighted works embodying his likeness—the song "In Da Club" and Jackson's performance of it. *Id*. at 45. According to Roberts, these copyrighted works were what Jackson ultimately sought to control, not Jackson's identity. *Id*.

The dispute in *Jackson* therefore centered on application of the subject matter prong—*i.e.*, "whether the focus of Jackson's claim is the recognizable sound of his voice (which is not within the subject matter of copyright) or the copyrighted work in which that voice is embodied (which, of course, is within the subject matter of copyright)." *Id.* at 47. Resolving whether Jackson's claim was preempted

17

ultimately required a fact-specific inquiry and depended on "the gravamen of the claim and the allegations supporting it." *Id*. As we explained, the "pertinent distinction" in this analysis was

> whether, on the one hand, the defendant's use of a work involving the plaintiff's likeness seeks advantage for the defendant on the basis of the plaintiff's identity—as where the plaintiff is identified in a manner that implies the plaintiff's endorsement, sponsorship, or approval (or in some cases the plaintiff's disapproval or rejection) of the defendant or its product, or holds opinions favored (or disfavored) by the defendant, or where . . . the value of what the defendant distributes lies in its reference to the identity of the plaintiff shown—what might be called 'identity emphasis,' which argues against preemption—or whether, on the other hand, the advantage sought by the defendant flows from the reproduction or dissemination of the work itself (as opposed to the persona of the plaintiff), which argues in favor of preemption.

*Id.* at 48–49 (footnotes omitted). More specifically, we noted that "the more the defendant has used a copyrighted work for its own value, as opposed to using it to exploit the depicted plaintiff's identity, the more the right of publicity claim brought by someone depicted in the work can be considered a disguised effort to control the dissemination of the work." *Id.* at 50.

To determine whether Jackson's right of publicity claim was preempted by the Copyright Act, we therefore needed to resolve whether Roberts's actions "could reasonably be construed by the intended audience as a false implication of

18

Jackson's endorsement or sponsorship of Roberts or his product." *Id*. After conducting a fact-specific inquiry, we ultimately concluded that "in the hip-hop world, the mere use, without more, of a sample from a well-known song, with acknowledgment of the identity of the sampled artist, does not communicate to the relevant audience that the sampled artist has endorsed or sponsored the sampling artist's work." *Id.* at 50–51. Accordingly, we held that the subject matter prong was satisfied because the focus of Jackson's claim was the musical composition and sound recording of his performance—*i.e.*, the copyrighted works themselves—and not Jackson's identity. Because the composition and recording fell within the "subject matter of copyright," and also satisfied the "general scope" or "equivalence" requirement, we held that Jackson's right of publicity claim was preempted. *Id.* at 45–46, 52–55.

Our holding in *Jackson* is instructive for our analysis here. As to the first requirement, we hold that Melendez's right of publicity claims come within the "subject matter of copyright." These recordings, in the language of the applicable statute, are "original works of authorship," 17 U.S.C. § 102(a), are "fixed in" a "tangible medium of expression," *id*. at § 101, and can be "perceived, reproduced, or otherwise communicated," *id*. Specifically, they fall within the category of

"sound recordings" under the statute. *Id.* at § 102(a) (7). Moreover, as in *Jackson*, Melendez's right of publicity claims are based on Sirius XM's use of the copyrightable works themselves—*i.e.*, portions of archival HS Show recordings that Sirius XM uses in its online and on-air advertisements.[6]

Melendez has not alleged that Sirius XM used his name or likeness in any way separate from, or beyond, airing excerpts of existing archival episodes in which he appeared. According to the amended complaint, the gravamen of Melendez's right of publicity claims is that Sirius XM used the challenged excerpts "to promote *The Howard Stern Show . . .* and Sirius XM in general, including, in particular, on channels that did not air the HS [Show] and thus are unrelated to Plaintiff's original appearances on the HS [Show]." Joint App'x at 8. Melendez directs his claims only at recordings of the HS Show—specifically, shortened versions of archival episodes in which he originally appeared. The amended

---

[6] As a threshold matter, we note that our analysis here does not depend on whether the works at issue are actually copyrighted because a claim can still be "subject to the possibility of statutory preemption" if the work is within the "subject matter of copyright" or, in other words, is "copyrightable." *Jackson*, 972 F.3d at 43–45. Here, the district court assumed that "the sound recordings at issue (the HS [Show] Archives) are not copyrighted" because Melendez appeared to contest the specific parameters of Sirius's license for the HS Show's archives in his amended complaint. *See Melendez*, 2021 WL 2593471, at *4 n.5. However, as Melendez conceded during oral argument before this Court, the recordings at issue are either "copyrighted or copyrightable." *See* Oral Arg. at 22:19–23.

complaint contains no allegations that his name or likeness was extracted in any way to appear independently from how it originally appeared in the archival episodes, or that the excerpts were manipulated in some manner to bring his identity into focus. Melendez's allegations, therefore, are directed at the copyrighted works in which he appears—the archival episode recordings—and not toward any separate use of his name or likeness. In other words, portions of the actual copyrightable works are what Sirius XM is allegedly reproducing and disseminating, not Melendez's name or likeness independent of the excerpts.

Moreover, there is no indication from Melendez's allegations in the amended complaint that Sirius XM has usurped his "*identity* to sell a product or service with which the plaintiff has no relevant connection." *Jackson*, 972 F.3d at 48. Instead, to the extent that Melendez appears in Sirius XM's promotional material, his appearances are in connection to a product to which he has a very relevant connection: the HS Show in which he appeared as a prominent cast member for over fifteen years. The challenged advertisements are for that same HS Show—not for a separate product or show on which Melendez has never performed or with which he otherwise has no connection.

Melendez attempts to rebut this point by arguing that Sirius XM airs the HS Show excerpts, in which he appears, in advertisements on its non-HS Show channels and in promotions for its entire platform. Even assuming that these allegations are true, which we must at the motion to dismiss stage, this distinction does not change our analysis of the subject matter prong. When the excerpts are used in the contexts Melendez challenges, they still remain inextricably connected to the HS Show because they are simply excerpts of longer archival episodes. In other words, any reference to Sirius XM in an advertisement about the archival episodes is identifying the technological medium that must be utilized to obtain access to the works at issue. *See Guglielmi v. Spelling Goldman Prods*, 25 Cal. 3d 860, 873 (1979) (en banc) (Bird, C.J., concurring) ("It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise.").

Therefore, Melendez's focus on the advertisements on the non-HS Show channels and for the platform more generally does not change the fact that his underlying challenge is to the unauthorized distribution and republication of copyrightable works, the excerpts of the archived episodes. Moreover, we agree with the district court that "Melendez has not [pled] any facts plausibly suggesting

22

that Sirius [XM's] intended audience could reasonably construe advertisements of the HS Show featuring Melendez as Stuttering John as Melendez's endorsement of Sirius XM or any of its non-HS Show channels." *Melendez*, 2021 WL 2593471, at *5. Any such inference would be as implausible as an audience somehow believing that (1) a network's advertisement for the broadcast of an upcoming National Football League game, containing video footage from a prior game, is a personal endorsement of that television network by every player featured in the game footage, or (2) a movie trailer containing excerpts from an upcoming movie played at a movie theatre, or on a television network, is a personal endorsement by the actors in that movie of that movie theatre and/or television network. As the Supreme Court noted in *Iqbal*, a court should not suspend its common sense in assessing plausibility. *See* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). In short, Melendez has failed to plausibly allege that any purported commercial gain to Sirius XM from such advertisements comes from his name or likeness, rather than from the excerpts of the archival episodes themselves that capture his identity.

23

Sirius XM has allegedly used the works at issue for over fifteen years for its own value in promoting its broadcasts of new and archival episodes of the HS Show and, in essence, Melendez's claims appear to be "a disguised effort to control the dissemination of the work." *Jackson*, 972 F.3d at 50. Therefore, the challenged excerpts come within the "subject matter of copyright" because, as in *Jackson*, the value to Sirius XM flows from the reproduction or dissemination of the works themselves, rather than from "the persona of the plaintiff." *Id*. at 49.

Our holding is consistent with Ninth Circuit decisions finding preemption by the Copyright Act of analogous right of publicity claims brought under California law, as well as with decisions by other courts analyzing similar claims in different states. *See, e.g.*, *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1011 (9th Cir. 2017) (right of publicity claim preempted when former student athletes challenged NCAA's selling to consumers photographs from the Division III national championship game because the athletes challenged only "the copyright holder's decision to distribute the copyrighted images themselves"); *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1144–45 (9th Cir. 2006) (rejecting singer's right of publicity claim against record company because the subject matter of the claim was a song recording, not her uncopyrightable persona or likeness in the form of her voice);

24

*see also Dryer v. Nat'l Football League*, 814 F.3d 938, 942 (8th Cir. 2016) (holding that right of publicity claim brought against NFL Films for using footage depicting plaintiffs during football games was preempted because plaintiffs did "not challenge the NFL's use of their likenesses or identities in any context other than the publication of [the] game footage"); *Ray v. ESPN, Inc.*, 783 F.3d 1140, 1144 (8th Cir. 2015) (finding right of publicity claim brought by wrestler against ESPN for re-telecasting copyrighted wrestling performances preempted because the performances were rebroadcasts of copyrighted film, not the use of his likeness or name to promote commercial products).

In contrast, the cases relied upon by Melendez to support his position are inapposite. In particular, in other cases where right of publicity claims were found not to be preempted, the plaintiff alleged that the defendant manipulated or imitated the plaintiff's identity or likeness or used the plaintiff's identity or likeness to support a product that was independent from the copyrighted work itself. *See, e.g.*, *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1011 (3d Cir. 2008) (defendant used plaintiff NFL broadcaster's voice in production about football video game); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1098 (9th Cir. 1992) (defendants used imitator to impersonate plaintiff Tom Waits's voice in radio commercial for

Doritos chips), *abrogated on other grounds by Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Downing*, 265 F.3d at 999–1000 (defendant used photograph of plaintiffs in a catalog to sell t-shirts identical to those worn by plaintiffs in a photograph from thirty years earlier); *Midler v. Ford Motor Co.*, 849 F.2d 460, 461 (9th Cir. 1988) (defendant used imitation of plaintiff Bette Midler's voice in car advertisement); *No Doubt v. Activision Publ'g, Inc.*, 702 F. Supp. 2d 1139, 1141–45 (C.D. Cal. 2010) (defendant distributed video game that went beyond its license to use plaintiff's band by allowing players to perform unapproved songs in unapproved ways); *see also Brown v. Ames*, 201 F.3d 654, 656–57 (5th Cir. 2000) (defendant record company misappropriated "the names and likenesses" of "individual blues musicians, songwriters, [and] music producers" on company's CDs, tapes, catalogs, and posters); *see generally Maloney*, 853 F.3d at 1018 n.13 (collecting and distinguishing other cases).

In a last-ditch effort to place his claims outside the subject matter of the copyrightable works at issue here (and more in the realm of the above-referenced, distinguishable cases), Melendez speculatively suggests, for the first time on appeal, that excerpts featuring him "could have been manipulated in ways that are clearly impermissible," such as "an advertisement for the HS [Show] or related

26

products that was scripted to use Mr. Melendez'[s] trademark stuttering affliction, 'S-s-s-subscribe to Sirius XM to get Howard 101.'" Appellant's Br. at 25. At oral argument, Melendez confirmed that this example was not contained in his amended complaint and he was not alleging that he had evidence of any such use by Sirius XM and that he was instead posing a hypothetical scenario that could potentially fall within the broad, conclusory allegations he asserted in his complaint.

We note that, because this argument was never raised in the district court, we need not consider it on appeal. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008). In any event, Melendez's argument regarding hypothetical facts would not allow his claims to survive a motion to dismiss because factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, Melendez cannot use any hypothetical allegations to "nudge[] [his] claims across the line from conceivable to plausible." *Id*. at 570. To the extent that Melendez asserts that his claims should not have been dismissed because whether this hypothetical scenario (or any similar uses) possibly occurred in this case are "all issues to be fully explored in discovery below," Appellant's Br. at 25, Melendez

27

misconstrues the pleading requirements. As the Supreme Court has emphasized, a plaintiff must allege facts supporting a plausible claim *before* being entitled to discovery and cannot hide behind broad legal conclusions to satisfy the pleading requirements. *See Iqbal*, 556 U.S. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *see also Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) ("In addressing the sufficiency of a complaint we accept as true all factual allegations and draw from them all reasonable inferences; but we are not required to credit conclusory allegations or legal conclusions couched as factual allegations." (citing *Twombly*, 550 U.S. at 555, 557)). Thus, neither Melendez's conclusory assertions in his amended complaint of an impermissible use nor his hypotheticals in support of those conclusions support a plausible right of publicity claim that is outside the subject matter of the copyright. Accordingly, the subject matter requirement for preemption is satisfied.

**B.** *General Scope Requirement*

Melendez's right of publicity claims also meet the general scope requirement for preemption. To satisfy this second requirement, the right Melendez asserts against the works in question within the subject matter of

28

copyright must be "equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). In other words, the challenged act must "by itself, infringe one of the exclusive rights provided by federal copyright law" through "reproduction, adaptation, performance, distribution or display." *Briarpatch*, 373 F.3d at 305.

When analyzing the general scope requirement, courts often look to the precise elements of the cause of action brought under state law and compare them to the elements that must be pled to bring a comparable claim under the Copyright Act. The existence of an extra element needed to bring a claim under state law may weigh against preemption. Any inquiry a court performs regarding the existence of an extra element "requires a holistic evaluation of the nature of the 'rights sought to be enforced,' and a determination whether the state law action 'is *qualitatively* different from a copyright infringement claim.'" *Jackson*, 972 F.3d at 44 n.17 (quoting *Altai*, 982 F.2d at 716). With respect to a state law claim based on the right of publicity, "[s]ome courts have held that, when a state's right of publicity claim includes [] a 'commercial purpose' or 'commercial use' requirement, that element constitutes an extra element, beyond what is required to establish a claim of copyright infringement, so that it takes right of publicity

29

claims outside the general scope of copyright, which does not require a commercial purpose as an element of a claim of infringement." *Id.* at 52.

Here, the cause of action for violations of the right of publicity under California statutory law includes the "extra element" of a commercial purpose. *See* Cal. Civ. Code § 3344. We previously encountered this same issue when examining application of the general scope requirement to the Connecticut right of publicity claim brought in *Jackson*. There, we emphasized that "[e]ven if a commercial purpose is a necessary element of a Connecticut right of publicity claim, this does not necessarily take the right of publicity outside of equivalency with the 'rights within the general scope of copyright.'" *Jackson*, 972 F.3d at 52–53. This is because "the focus of the 'equivalency' analysis is on whether the 'nature' of a state law action 'is qualitatively different from a copyright infringement claim.'" *Id.* at 53 (quoting *Altai*, 982 F.2d at 716). Under our precedent, we explained, a "commercial purposes element does not sufficiently change the nature of a similar state law claim so that it is qualitatively different from a copyright infringement claim." *Id.* at 53–54 (alteration adopted and internal quotation marks omitted). Indeed, we observed that "commercial interests have always played an enormous role in copyright law." *Id.* at 53.

30

For these same reasons, we do not find that the California statutory requirement that Melendez prove a commercial purpose for his right of publicity claim is dispositive. Instead, to assess whether Melendez's right of publicity claims are qualitatively different for purposes of the general scope analysis, we look holistically at what he "seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Briarpatch*, 373 F.3d at 306 (quoting *Altai*, 982 F.2d at 716). On this point, our prior analysis regarding the subject matter prong is instructive. As we previously explained, Melendez's right of publicity claims are simply attempts to prevent Sirius XM from rebroadcasting, in advertisements for the HS Show on Sirius XM and elsewhere, portions of archival episodes of the HS Show on which Melendez appeared. Ultimately, his right of publicity claims, under both common and statutory law, are aimed at stopping the reproduction of copyrightable works that embody his identity—the excerpts of the archival episodes of the HS Show—not the independent use of his identity to sell unrelated goods or services without his permission. In other words, Melendez's claims are "in no meaningful fashion distinguishable from infringement of a copyright." *Nat'l Basketball Ass'n*, 105 F.3d at 851. The works Melendez challenges are not only sufficiently equivalent to

rights protected by federal copyright law, but are indeed protectable under federal copyright law. Therefore, Melendez's right of publicity claims satisfy the general scope requirement for preemption. *See Laws*, 448 F.3d at 1144 ("The mere presence of an additional element ('commercial use') in section 3344 is not enough to qualitatively distinguish [a] right of publicity claim from a claim in copyright" because the "extra element must transform the nature of the action"; and "the underlying nature of Law's state law claims is part and parcel of a copyright claim" because the "claims are based on the premise that Sony reproduced a sample of [the song] for commercial purposes without her permission").

In sum, our review of the allegations in the amended complaint persuades us that the right of publicity claims in this lawsuit are based on works that come within the subject matter of copyright under Section 102(a) of the Copyright Act, and the right being asserted is equivalent to exclusive rights within the general scope of copyright. Accordingly, the district court properly dismissed the right of publicity claims under California law on preemption grounds.[7]

---

[7] In the alternative, Sirius XM argues, as it did before the district court, that Melendez implicitly waived his right to publicity claims by waiting fifteen years to bring them because "[h]is silence objectively manifests consent to the broadcasts of the HSS Archives." Appellee's Br. at 35. Because we find that the claims were properly dismissed on preemption grounds, we (like the district court) decline to address this alternative ground for dismissal.

**C.** *Leave to Amend*

Finally, Melendez argues that the district court incorrectly found that any attempt to re-plead would be futile and, instead, should have afforded him leave to amend his complaint for a second time. Without proposing any specific amendments, Melendez contends that re-pleading would not be futile because he is "confident" that he can cure any pleading defect. Appellant's Reply at 18.

"Although we generally review denials of leave to amend for abuse of discretion, in cases in which the denial is based on futility, we review de novo that legal conclusion." *Shimon v. Equifax Info. Servs. LLC*, 994 F.3d 88, 91 (2d Cir. 2021). Generally, a "plaintiff need not be given leave to amend if [he] fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in [his] complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

Here, Melendez has failed to articulate, either in the district court or on appeal, any additional allegations that he could assert in a second amended complaint that could save his right of publicity claims from preemption. In particular, he points to no allegations that could be added regarding any use of the works at issue by Sirius XM separate from, or beyond, its use of excerpts from the archival episodes in advertisements for the HS Show, including advertisements

33

for the entire Sirius XM platform. Accordingly, he has failed to demonstrate how any attempt to re-plead would not be futile. *See, e.g.*, *Anderson v. Aset Corp.*, 416 F.3d 170, 171 (2d Cir. 2005) (finding any amendment "would be futile because preemption would defeat his state-law claim"); *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (per curiam) ("A counseled plaintiff is not necessarily entitled to a remand for repleading whenever he has indicated a desire to amend his complaint, notwithstanding the failure . . . to make a showing that the complaint's defects can be cured.").[8]

We therefore find no error in the district court's denial of leave to amend and the dismissal of his right of publicity claims with prejudice.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

[8] We also note that Melendez filed his amended complaint after receiving Sirius XM's motion to dismiss, and, thus, even had that opportunity to amend after being made aware of the preemption issue. *See, e.g.*, *TechnoMarine*, 758 F.3d at 506 (affirming dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff filed another amended complaint before the district court's decision and failed to "resolve [the] pleading deficiencies" contained in the prior complaint).